PATTERSON *v.* MILLER.

Opinion delivered June 5, 1922.

1. DEEDS—INTEREST OF GRANTOR CONVEYED.—The effect of a deed which does not limit the grantor's interest conveyed is to convey his entire interest, but he may convey a particular interest; and when this is done only that interest is conveyed, and the grantor reserves to himself all he has not conveyed.

2. TENANCY IN COMMON—ADVERSE POSSESSION OF CO-TENANT.—The grantee of an undivided one-half interest in land could not acquire title by adverse possession to any part of the land except that of which he had actual pedal possession as against his co-tenants.

3. TENANCY IN COMMON—CO-TENANT IN POSSESSION TO PAY TAXES.— A tenant in common in possession of the land, who has received rents enough to keep the taxes paid, was required to pay the taxes for the benefit of himself and his co-tenants.

4. TENANCY IN COMMON—ADVERSE POSSESSION.—Entry on the land by a tenant in common is presumed to be in subordination to the rights of his cotenants, and his occupancy, for whatever length of time continued, is not adverse to his co-tenants until affirmative knowledge has been brought home to them that his possession is hostile and adverse.

5. TENANCY IN COMMON—ADVERSE POSSESSION—EVIDENCE.—Evidence *held* insufficient to overcome presumption that owner of undivided half interest, in occupying same, did not hold adversely to his co-tenants.

6. TAXATION—PURCHASE OF ONE WHO SHOULD HAVE PAID TAXES.— Where a bank neglected its duty as agent of a taxpayer to pay the taxes on land, and permitted the land to be sold for non-payment thereof, its purchase at the tax sale amounted merely to the payment of the taxes.

7. TENANCY IN COMMON—ADVERSE POSSESSION.—Where a tenant in common conveys the whole title, the grantee by adverse possession for the requisite period can acquire title by limitation, the conveyance of the whole title constituting an act of ouster.

Appeal from Crittenden Chancery Court; *Archer Wheatley,* Chancellor; reversed on cross-appeal, affirmed on appeal.

*Randolph & Randolph* and *Hughes & Hughes,* for appellants.

1. The findings by the chancellor lead, we think, to a decree of broader scope in favor of the Hill title

than the decree actually rendered. Hill did have color of title, and his title by adverse possession ought not to have been confined to the tracts actually occupied, and to that extent the court took an erroneous view of the deed under which he held. 50 Ark. 340, 345; 63 W. Va. 623, 129 Am. St. Rep. 1024, 1031-1032; Freeman on Co-Tenants, § 328; 27 Calif. 549; 55 Mich. 111.

2. The title of appellants was good to the whole of the lands under the seven years' statute; but if not, it was good under the two years' statute. The tax deeds to Beck and his deed to Mrs. Hill were admittedly void; nevertheless they were color of title under the statute of two years.

It is true that a co-tenant buying in an outstanding tax title while the co-tenancy exists, does not hold adversely, but takes for the benefit of all; but the case is different where the co-tenancy no longer exists because of a previous ouster, and the holding is already adverse. In the latter case he may acquire a tax title and set it up in himself. 38 Cyc. 50-51, 7 R. C. L. 861; 21 Wis. 331; 28 Am. Dec. 86; 8 Am. and Eng. Am. cases, 990.

3. The appellees are barred by laches from setting up the claim they now assert. The chancellor, on the authority of *Taylor* v. *Leonard,* 94 Ark. 122, declined to apply this doctrine to the whole claim, though applying it to the claim for rents and profits. It should have been applied to exclude appellees from all relief. They do not set up a legal title, but, if any, an equitable title only. Moreover, their claim is not divisible.

4. If the deed made in 1889 by Apperson to Hill is properly construed as conveying to Hill an undivided half interest in the land described, the court is justified in presuming from the long continued possession and use of the land by Hill, his representatives and tenants, that he acquired in a lawful manner the entire title to the tract. 92 Tenn. 753-754; 120 U. S. 534; 175 U. S. 520; 138 Fed. 772; 135 Ark. 232; 2 Corpus Juris, 288-291.

*B. J. Semmes* and *Berry & Wheeler,* for appellees.

1. There is no evidence, either direct or circumstantial, of an ouster.

It is not disputed that one who holds open, notorious and hostile adverse possession of land for the requisite time without title is entitled to the land so held, but to enlarge the limits thereof beyond that in actual occupancy, there must be color of title. 80 Ark. 82. As to co-tenants, the rule is that if the deed conveys only an undivided interest, it is color of title only as to the interest conveyed. 2 C. J. 185; 7 R. C. L. 856; 77 N. E. 142; 102 Ark. 611, 145 S. W. 537.

2. The theory that, even though the tax deed to Beck was void, it still constituted color of title, and that therefore appellants are entitled to relief, is not tenable. 55 Ark. 104; 128 *Id.* 605; 133 *Id.* 441; 7 R. C. L. 824; 94 Ark. 122.

On the cross-appeal:

1. The burden of establishing the ouster was upon Patterson and McGehee. The making of leases, sale of timber, payment of taxes and collection of rents introduced by them as evidence, are all presumed to be under the true title, and not hostile. The ouster must be clearly proven.

2. No title to the tract of land vested in Bates *et al.* by virtue of the deed of W. W. Miller and wife, Minetry Myers Miller. The deed explains itself simply as intending to determine the estate in reversion caused by a condition broken in a deed from S. U. Apperson. Years before Apperson had died, and there was no title to revert to Mrs. Miller. 2 C. J. 290; 30 N. E. 96.

SMITH, J. This suit originated as a bill in equity to quiet title to the north half and the fractional southwest quarter section 31, township 8 north, range 6 east, Crittenden County, Arkansas. The plaintiffs are Geo. W. Patterson and H. A. McGehee, who purchased the lands from Mrs. Olivia Hill Grosvenor, who had, in turn, acquired them from her mother, Mary M. Hill, the widow

of Napoleon Hill. The defendants, among others, included the heir of D. E. Myers, deceased, viz., his daughter, Minetry Myers Miller, and the heirs of Wm. M. Sneed, deceased, viz., Mary B. Neely, Louise Sneed Hill, Richard Sneed, and Hampton Fenton Sneed. The complaint deraigned title and prayed that title to the lands be quieted in the plaintiffs.

The defendant, Minetry Myers Miller, filed an answer and cross-complaint, in which she sought, as the sole heir of D. E. Myers, deceased, to assert an undivided one-fourth interest in said lands. She prayed that her interest be established and that partition of the land be made in kind.

Minetry Miller, a daughter of Minetry Myers Miller, filed an intervention and cross-complaint, in which she averred that under the will of D. E. Myers she was entitled to a remainder interest in the land sought to be recovered by her mother, and she adopted the answer and cross-complaint of her mother. As an additional cross-complaint she averred that Mary N. Hill and Olivia Hill Grosvenor had collected rents and profits for which they should account. The heirs of Sneed averred their ownership of an undivided one-fourth interest in the lands, and adopted the answer and cross-complaint of Minetry Myers Miller. They also prayed judgment for rents and profits. All other defendants defaulted.

Mary M. Hill and Olivia Hill Grosvenor filed an answer to the several cross-complaints in which defenses are set up which will later be discussed. The plaintiffs Patterson and McGhee adopted as their answer to the several cross-complaints the answer thereto of Mrs Hill and Mrs. Grosvenor.

The cause was heard by the chancellor on the very voluminous record now before us, and a recovery of a certain part of the lands was awarded Mrs. Miller and her daughter, and the Sneed heirs were also awarded a recovery of a certain interest in the lands; but the court denied any recovery against Mrs. Hill and Mrs. Gros-

venor for rents and profits. The plaintiffs' title was quieted against the other defendants as. to all parts of the lands not recovered under the cross-complaints.

Under the finding thus made the parties stipulated as to the taxes and improvements, the claim for rents being disallowed; but this stipulation does not suffice for us to render a final decree here, because we do not concur in certain of the chancellor's findings, as will later appear, and the parties may, if they are so advised, take further testimony on the question of rents and profits and betterments. From the findings and decree of the chancellor all parties whose interests in the litigation have been set out have appealed.

The chancellor prepared an opinion in which he re-cited a number of facts. Such of these as are essential to a statement of the case are as follows:

On April 18, 1870, E. N. Apperson acquired as trustee the title to about 40,000 acres of swamp land lying in Crittenden and other counties in Arkansas, the land in litigation being the first tract described in his deed. The equitable title to the lands at that time was held as follows: E. N. Apperson, 3/8; G. V. Rambaut, 1/8; Napoleon Hill, 2/8; W. H. Wood, 2/8. Rambaut sold his 1/8 interest to Apperson. The deed under which Apperson held as trustee gave him power to convey the fee title, the beneficiaries being interested only in the proceeds of the sales of the lands. These titles became incumbered with tax sales, and Apperson employed D. E. Myers and W. N. Sneed, law partners as Myers & Sneed, to discharge these liens and to straighten up the titles to the lands. This contract was evidenced by a deed dated July 18, 1887, which recited that it was to take effect as of October 28, 1882. This deed conveyed to Myers & Sneed an undivided half interest in all the lands there described as compensation for services performed and to be performed. This deed was not filed for record until June 13, 1890.

On January 28, 1888, Apperson, as trustee, executed to Napoleon Hill a deed conveying an undivided half in-

terest in certain of these lands, including all of section
31, township 8 north, range 6 east. We quote from this
deed, as we think it has a very important bearing on the
litigation. The grantor recites that, for the consideration
of $1,401.75, he has "this day sold and do by these
presents alien and convey unto Napoleon Hill aforesaid,
an undivided one-half interest in the following real es-
tate." Following a description of the lands, it is recited
that "all of said lands herein conveyed being an un-
divided one-half of all the same. * * * But I, the said
E. M. Apperson, do hereby convey not only such claim
as I own or have in said undivided half of said lands in
my own right, but likewise any and all claim or title vest-
ed in me as trustee. It being my intention to make to
said Hill, and his heirs and assigns, a clear deed to one-
half of said real estate as trustee and otherwise.* * *"
It will be borne in mind that at the time of the execution
of this deed the trustee owned only an undivided one-
half, as he had previously conveyed an undivided one-
half to Myers & Sneed. The deed to Hill was filed for
record June 16, 1888.

W. M. Sneed died testate in 1895, and devised the
bulk of his estate to his executrix as trustee, and through
a bill filed by D. E. Myers, as attorney for the executrix,
in the chancery court of Shelby County, Tennessee, the
estate was administered in insolvency; and it is insisted
that neither in the will nor in the insolvency proceeding
was any reference made to the deceased's claim of an
interest in the lands here in litigation.

In 1899 D. E. Myers, as his own attorney, brought
suit against all persons for whom Apperson (who was
then dead) had been trustee. This suit did not include the
land in section 31-8-6, for the reason, no doubt, that the
trustee had previously divested himself of the title by his
deed to Myers & Sneed and the deed to Napoleon Hill.
The lands involved in the suit by Myers were sold, and
the bulk of them was purchased by Noland Fontaine as
trustee for those interested in a syndicate, the decree re-

citing the beneficiaries and their interests. Fontaine was the business associate of Hill, and Myers represented Hill as attorney in many matters, particularly in the management of the Arkansas lands, and the testimony shows that a close and intimate friendship existed between Hill and Myers. It is also shown that Myers frequently borrowed money from Hill, and on one occasion at least had given Hill a deed of trust on his Tennessee property, to secure such advances, but the deed of trust was not placed of record. Fontaine, as trustee, managed the lands vested in him as trustee under the supervision of Myers until 1910, when the trust was finally settled.

Myers died testate in 1910, and by his will vested his estate in the Union & Planters Bank & Trust Company of Memphis, as trustee, to manage the estate and to pay the income thereof to his daughter, Mrs. Miller, for her life, with remainder to her children. The trustee accepted the trust, and was engaged in managing the estate at the time this litigation was begun. A son of Napoleon Hill has for some years been president of the Union & Planters' Bank & Trust Company.

It is insisted that Mrs. Miller recognized that she had no interest in the land here involved, because she had, in 1911, executed a deed to the defendants, Bates, Stratton and Buchanan, conveying an undivided two-thirds of an undivided one-fourth part in a large quantity of land formerly belonging to the syndicate, including the land in suit, which she pretended to own through another chain of title said to be antagonistic to the chain of title set up in her cross-complaint. The lands had been conveyed by E. N. Apperson prior to the execution of a declaration of trust by Apperson in 1870 to the St. Louis & Memphis Railroad Company by a deed containing the condition subsequent that the grantee build a railroad, and that condition had never been performed.

The deed to Bates *et al.* has this caption: "Quitclaim Deed to Lands conveyed by E. N. Apperson and Susan B. Apperson to the St. Louis & Memphis Railroad

Company by conditional deed, said company having forfeited said lands. Re-entry is hereby made, determining said estate in reversion.'' Following this caption the deed has the following recitals: ''Know all men by these presents: That we, W. W. Miller and wife, Minetry M. Miller, *née* Minetry Myers, sole surviving heir-at-law of Emma Myers, deceased, *née* Emma Apperson, wife of D. E. Myers, deceased, and daughter of E. N. Apperson and Susan B. Apperson, and one of the four heirs-at-law of the said E. N. Apperson and Susan B. Apperson, deceased, late of the County of Shelby and State of Tennessee, reserving to ourselves one-third net of an undivided one-fourth part of the hereinafter described lands. * * *''

The purpose of this deed was to make re-entry determining the estate in reversion created by the deed from Apperson to the railroad.

There is a presumption, of course, that a grantor intends to convey his entire interest by his deed, and such is the effect of a deed which does not limit the interest conveyed. But a grantor may convey a particular interest, and when this is done only that interest is conveyed, and the grantor reserves to himself all he has not conveyed. *Cocks* v. *Simmons,* 55 Ark. 111.

The deed to Bates *et al.* is, by its express terms, a quitclaim deed. It contains no covenants of warranty. It describes all the lands contained in the deed from Apperson to the railroad and, for the purposes of making re-entry, conveys the undivided one-fourth interest of Minetry Myers Miller as the granddaughter of Apperson. The other three heirs of Apperson made similar conveyances. After defining the purpose of the deed and the extent of the interest of Mrs. Miller as an heir of Apperson, she proceeds to convey this interest, ''reserving to ourselves one-third net of an undivided one-fourth part of the hereinafter described lands.'' In other words, this is a quitclaim deed to the interest of Mrs. Miller in the estate of her grandfather, less a third of that quarter which she reserved to herself; but, as has been shown, Apperson

owned no interest in the land in suit at the time of his death.

It is contended, and the chancellor found the facts to be that, after Hill obtained his deed from Apperson, he proceeded to have the land put in cultivation under leases signed by him as owner; that he paid the taxes in his own name, and collected the rents for his own benefit, for a period of thirty years; and that he sold the timber thereon for his own account. The chancellor found that this possession gave Hill title to the land which he had actually occupied, but that, as his deed conveyed only an undivided one-half interest, his possession could not be enlarged to the extent of the boundaries of the lands described in the deed so as to include the undivided half interest of his cotenants which was not embraced in his deed; in other words, that Hill had no title or color of title to the half interest of his cotenants, and he could not, therefore, acquire title to any part of the land except that of which he had actual pedal possession.

In addition to the facts stated, Mrs. Grosvenor claims title to the land as follows: After the death of Napoleon Hill, the Union & Planters' Bank & Trust Company, as the agent for his estate, permitted the land to sell in 1912 for the taxes of 1911, at which sale J. O. E. Beck became the purchaser. Beck obtained a tax deed from the clerk, and on May 17, 1915, executed to Mrs. Hill a quitclaim deed. As this suit was not filed until December 24, 1919, it is said that the four years' possession under this tax deed has ripened into title.

It is pointed out that the deed from Apperson to Hill was recorded before the deed from Apperson to Myers and Sneed was recorded, and it is insisted that, as the deed was intended to convey the whole title, it should be given that effect because it was first placed of record. We think, however, there is no conflict in the deeds. The deed to Hill, by express language, purports to convey only an undivided one-half interest, and it is not contended—indeed, under the record before us it could not well be

contended—that Hill was unaware of the deed to Myers & Sneed made prior to his deed and pursuant to a contract by which the trustee was to convey to Myers & Sneed an undivided half interest in all the lands in consideration of services rendered and to be rendered by Myers & Sneed. We regard it as a fact beyond dispute that Hill knew of the prior deed to Myers & Sneed at the time the deed was executed to him.

It is undisputed that Hill and those claiming under him have paid all taxes, and that receipts therefor were taken in Hill's name.

One Throgmarten testified that in 1889 he cleared about ten acres of this land, although he had no deed or other claim to it, and that about the time he finished his clearing one G. W. Scott made some claim to the land. Throgmarten knew Scott had no title to the land, but to avoid trouble he surrendered its possession. However, he shortly after this reported to John R. Chase, at Marion, who was an abstracter of land titles, and also Hill's agent, what had occurred between himself and Scott. Soon thereafter Chase prepared a lease to Scott in which Hill was designated as owner, but in a letter to Hill from Chase on this subject Hill is advised by Chase that he owned an undivided three-fourths interest in the land.

It does not appear to be a fact that no Arkansas lands were included in the Sneed administration. In a general creditor's bill filed by the executrix there was listed in the assets of the estate "an undivided five-sixths interest with D. E. Myers and Napoleon Hill, in several thousand acres of wild and timbered land in Arkansas; also a one-half undivided interest with D. E. Meyers in several thousand acres of like lands in Arkansas, value unknown."

The will of D. E. Myers is in the record, and no land is mentioned in his will specifically. He disposed of his estate in general terms.

So far as the deed from Mrs. Miller to Bates *et al.* is concerned, it may be said that the decree was entered

against those defendants for want of an answer, and we may treat any interest there conveyed as canceled; but the execution of that deed and its cancellation by the decree herein has no effect on the title here sought to be asserted, for the reason, as shown above, that it undertook to convey an interest acquired through her grandfather, E. N. Apperson. The interest which Mrs. Miller here seeks to assert is through D. E. Myers, her father, and not Apperson, her grandfather, and she did not purport to convey the interest she now seeks to assert.

While cross-appellants concede that Hill paid the taxes in his individual name, there appears to be no evidence that Hill had them assessed in his individual name; and, while the findings of the chancellor recite the fact to be that the lands were assessed in Hill's name individually, we find no testimony upon which that finding could be based. It is not admitted by cross-appellants that no contribution was made by Myers and Sneed for the taxes paid by Hill. It is their insistence that the conduct of the parties in regard to other tracts of land indicate they must have contributed. This may or may not be true, and this question may be more fully developed on the remand of the cause if the parties are so advised. It is insisted, however, that, if no contributions were made by Myers and Sneed, Hill received enough rents to keep the taxes paid; and this appears to be true; and, if true, it was Hill's duty to keep the taxes down for the benefit of himself and his cotenants.

The designation of Hill as the owner of the land in the leases prepared by Chase is not shown to have been known to Hill's cotenants; but it is shown to have been an untrue designation, according to the letter from Chase, the man who employed that term in the leases he prepared, as he advised Hill that he was the owner of an undivided three-fourths interest.

It is admitted that Hill sold some timber on this land; but the claim is made by appellees that Hill used the proceeds of such sales in the payment of taxes; but

it is not affirmatively shown in the testimony that he made any such use of the proceeds of the timber sold by him. It is admitted that the land was known as the "Hill land", but it is said it was so called from the fact that Hill was interested in and had charge of its management.

It may here be said that if Myers and Sneed and Hill had owned as cotenants only the land here sued for, the chancellor's finding that Hill had held adversely to his cotenant could not be set aside as contrary to the preponderance of the evidence. But this was not the only land owned by them, and the conduct of the parties with reference to the other trusts must be considered as explanatory of Hill's possession of the land in litigation.

The deposition of M. T. Roush was taken, from which it appears that he was stenographer and clerk for Hill, and that he prepared under Hill's direction a list of Hill's Crittenden County lands. Of the twenty-eight tracts of land in Crittenden County conveyed to Napoleon Hill by E. M. Apperson, eleven are shown on page twelve of Roush's land-book as being lands claimed by Hill at the time the book was made.

It will be remembered that these eleven tracts, including the land in suit, were all in a deed from Apperson to Hill; and it is stipulated that Hill had no other deed to any of these lands except the deed from Apperson. He had the same interest, therefore, in all these lands, and the disposition of the other tracts is significant in determining the interest claimed by him in the land in suit. It is admitted that the first of these tracts was never sold by Hill, and that the title was lost by the adverse possession of a third party.

A notation at the bottom of the page containing this list of lands shows that the second and third tracts were deeded to J. T. Barton on January 2, 1900, and the testimony of Barton is peculiarly significant. An objection to the title was made, and Barton went to Meyers, who "claimed an interest in the land," as testified by Barton. The deed to Barton shows a consideration of $800 paid

on January 2, 1900. There is in the record a deed dated March 15, 1906, from Myers, individually and as surviving partner of Myers & Sneed, and the executrix of Sneed, to Napoleon Hill, conveying an undivided one-half interest in these second and third tracts on Hill's land-book, for the consideration of $548.87, cash in hand paid by Napoleon Hill. Attention is called to the fact that six years, two months and thirteen days elapsed between the date of the deed from Hill and the one to him, and that six per cent. interest on $400, or one-half of the consideration paid by Barton, for the time Hill had the whole consideration in his possession, amounts to exactly $548.87, the consideration recited in the deed to Hill.

As to all the other tracts of land in the land-book, it is shown that all the land was sold except the land in litigation. These sales were made to witnesses Shaver, McBee and Morrison. These witnesses testified that in negotiating the purchases of these tracts of land they went to Myers and made their contracts with him. These contracts were made in the lifetime of both Hill and Myers, and deeds were signed by both of them and by the Sneed heirs, and the proceeds divided in proportion to the record title. The last of these sales was made in 1909, just four months before Hill died, and the consideration therefor was divided between the owners in proportion to their record title in June, 1910.

It thus appears that Hill had the same title to all eleven tracts of land, and that all the land was sold in Hill's lifetime and in the lifetime of Myers, or lost by adverse possession, except the land in suit, and the proceeds divided in accordance with the paper title.

Hill died November 2, 1909, and Myers a few months later. They had many transactions together, and were close personal friends, according to the undisputed evidence; and upon the death of Myers his estate was administered, and is now being administered, by the same agency which has charge of the Hill estate.

As has been said, we do not think the title of Hill to the land in litigation can be correctly determined without taking into account the conduct of the parties in regard to all the lands described in Hill's Arkansas landbook. It is not claimed that he had any title except that derived from Apperson, and he had the same interest in all the lands, and as the lands were sold the proceeds of the sales were divided.

It is said that, in view of Hill's long continued possession of the land in suit, the presumption should be indulged that Myers and Sneed conveyed their undivided half interest to Hill, and that for some reason the deed was lost or destroyed. We do not think so, because the conduct of the parties in regard to the other lands rebuts the presumption of a grant to Hill. Besides, Hill, as a tenant in common, had the right to enter and take possession of the land. The presumption is, of course, that Hill's entry was in subordination to the rights of his cotenants, and his occupancy of the land, for whatever length of time continued, was not adverse to his cotenants until the affirmative knowledge had been brought home to them that Hill's possession was hostile and adverse.

It is said that Hill's possession was adverse, and that, being adverse, the possession extended to the boundaries of the deed under which he had entered, and gave him constructive possession of and title to the entire tract; but we do not consider this question, as we have reached the conclusion that Hill's actual possession was not adverse.

In the recent case of *Jackson* v. *Cole,* 146 Ark. 565, we said: "It is the law, as was stated in the case of *Wilson* v. *Storthz,* 117 Ark. 418, that one entering upon the possession of land, under a deed of conveyance to him, is presumed to occupy, and intends to claim, only the interest named in his conveyance." In the case just cited we quoted with approval from 7 R. C. L. pp. 854, 855 (Title, "Cotenancy"), the following statement of the law: "In considering this question the familiar prin-

ciple is recalled that, when one enters upon land, he is presumed to enter under the title which his deed purports upon its face to convey, both as respects the extent of the land and the nature of his interest."

In that case the entry was made under a deed purporting to convey the whole title, and, indulging the presumption just stated, we held the possession was adverse. We did so upon the theory that the occupant claimed the interest conveyed to him.

In 2 C. J., p. 185, at section 355 of the article on "Adverse Possession," it is said: "Where real estate is held in common, and one tenant assumes to convey the entire estate and does convey it by metes and bounds, the deed will give color of title as to the whole tract, and an entry by the purchaser thereunder claiming title to the whole will operate as an actual ouster and disseizin of the cotenant. If, however, the deed conveys only an undivided interest it is color of title only as to the interest conveyed."

This accords with our holding in the case of *Jackson v. Cole, supra.*

The presumption is that Hill claimed only the interest conveyed to him, and that was an undivided half interest. This deed made him tenant in common with Myers and Sneed, and gave him the right to enter upon the land, and, having done so, the further presumption arose that his occupancy was not adverse to his cotenants. *Wilson v. Storthz, supra; Parsons v. Sharpe,* 102 Ark. 611; *Singer v. Naron,* 99 Ark. 446; *Bayles v. Daugherty,* 77 Ark. 201; *Goodwin v. Garibaldi,* 83 Ark. 74; *McKneely v. Terry,* 61 Ark. 527.

When the conduct of the parties is considered, not with reference alone to the land sued for, but that of all the land in which Hill had an undivided interest, we do not think these presumptions have been overcome.

As to the possession under the tax title acquired by purchase from Beck, but little need be said. The sale was void. Moreover, it was the duty of the Union & Planters'

Bank & Trust Company, as agent for Mrs. Hill, to pay the taxes, and the omission to do so was an inadvertent one. This bank was also the trustee for the Myers estate. This purchase by the bank for Mrs. Hill amounted to no more than a payment of the taxes, and Mrs. Hill is entitled to a credit only for the sum required to effect a redemption by purchasing the land from Beck. *Inman* v. *Quirey*, 128 Ark. 605.

Under the case of *Jackson* v. *Cole, supra,* the deed from Mrs. Hill to Mrs. Grosvenor, conveying the whole title, was an act of ouster, and possession under that conveyance would have ripened into title had it been continued for the requisite period; but this deed was not made until September 6, 1918, and the cross-complaints herein were filed in January and February, 1920.

As has been stated, the court below found that there had been an ouster by Hill of his cotenants as to the lands which he had actually occupied for a period of more than seven years before the filing of the cross-complaints herein; but, as we do not think the testimony shows an ouster by Hill of his cotenants, even as to the lands actually occupied, that decree will be reversed. It is therefore ordered that the cause be remanded, with directions to the court below to enter a decree awarding to the heirs of D. E. Myers an undivided fourth interest and to the heirs of Wm. M. Sneed an undivided fourth interest, after stating the account between the parties as to rents, taxes and improvements.